USA v. Frank N. Staples

24-po-23-SM-1

Opinion No. 2025 DNH 060

Late Motion for Reconsideration and Conditional Notice of Appeal

Introduction

NOW COMES Defendant Frank N. Staples, appearing sui juris (in his own right, without counsel), and hereby moves for reconsideration of this Court's Order on Appeal (Document 45) dated May 9, 2025, which denied his appeal and affirmed his conviction. Defendant seeks dismissal of the charge in its entirety for lack of jurisdiction and constitutional violations, or in the alternative, oral argument on all issues raised herein. In support of this motion, Defendant reasserts the following dispositive arguments:

The Government failed to establish subject-matter or territorial jurisdiction at arraignment or any time thereafter, as required by law. The United States never proved that it had jurisdiction over the location of the alleged offense – the Warren B. Rudman U.S. Courthouse – especially in light of New Hampshire's jurisdictional statute RSA 123:1 and the Government's non-compliance with its requirements.

The Court's reliance on United States v. Gerhard, 615 F.3d 7 (1st Cir. 2010), was misplaced, as that decision did not address RSA 123:1 or the core jurisdictional arguments raised here. Moreover, subject-matter jurisdiction is fundamental and cannot be waived or bypassed by claims of "lack of standing" when the issue is the very power of the federal government to prosecute the offense in question.

The charging instrument was defective and failed to provide adequate notice of the charges. It contained only conclusory language and omitted reference to essential regulatory provisions (such as 41 C.F.R. § 102-74.420 and Local Rule 83.8) that define the scope of the alleged offense. The vague and cursory allegations violated Defendant's Fifth and Sixth Amendment rights by failing to inform him of the nature and cause of the accusation.

The prosecution of this case constituted selective enforcement and viewpoint discrimination in violation of the First Amendment, Due Process, and Equal Protection. The Government singled out Defendant for exercising his rights (recording in a public building) while others similarly situated were not prosecuted, evidencing a discriminatory purpose and effect. Such arbitrary enforcement of the no-recording rule offends fundamental constitutional principles.

Defendant asserts his status as a sui juris litigant and highlights that no transcript or audio recording of the trial proceedings is available. The absence of any reliable record of the trial is a structural denial of due process that has crippled Defendant's ability to secure meaningful appellate review. This Court's affirmance of the conviction despite the lack of a transcript (and without providing an oral argument) underscores the due process deprivation at issue.

Defendant's arguments are set forth more fully below. Given the gravity of these issues, Defendant respectfully urges the Court to vacate the conviction and dismiss the charge, or at

minimum to grant a hearing to address these matters. Should the Court deny reconsideration, Defendant hereby provides notice of appeal to the First Circuit, as discussed at the conclusion of this motion.

I. Lack of Subject-Matter and Territorial Jurisdiction

A. Failure to Establish Jurisdiction at Arraignment or Trial. From the outset of this prosecution, the Government has never met its burden to establish that the federal court has jurisdiction over the location where the alleged offense occurred. The charge against Defendant arose from events inside the Warren B. Rudman U.S. Courthouse in Concord, NH – a location which, on its face, is within the State of New Hampshire. It is a basic principle that if the United States wishes to exercise exclusive or even concurrent criminal jurisdiction over land within a state, it must do so in accordance with both federal and state law. Here, the Government introduced no evidence at arraignment or trial to prove that the courthouse property is subject to federal jurisdiction (exclusive or concurrent). There was no documentation, no testimony, and no stipulation establishing that the United States had obtained and accepted jurisdiction over the land as required. Absent such proof, the court lacked subject-matter jurisdiction over the alleged offense, which is grounds for dismissal ab initio.

B. RSA 123:1 – State Consent and Cession Requirements Ignored. New Hampshire law (RSA 123:1) explicitly conditions federal jurisdiction over lands in this State on a formal cession process. RSA 123:1 provides that **"Jurisdiction is ceded to the United States of America over all lands within this state now or hereafter exclusively owned by the United States, and used as sites for post offices, custom-houses, military … or other public buildings; provided, that an accurate description and plan of the lands so owned and occupied, verified by the oath of a United States officer, shall be filed with the secretary of this state; and, provided, further, that this cession is upon the express condition that the state of New Hampshire shall retain concurrent jurisdiction…"**. In short, for the United States to wield jurisdiction at the courthouse, an accurate description and plan of the property had to be filed with the NH Secretary of State, and New Hampshire retains concurrent jurisdiction unless and until the property is relinquished.

Defendant raised this RSA 123:1 issue throughout the proceedings, yet the Government never produced any evidence of compliance with RSA 123:1 – no filed plan or description, no oath, nothing. Compliance with RSA 123:1 is not a mere formality; it is the State's statutory prerequisite for ceding jurisdiction. The Government's silence on this point is an admission that it failed to meet the cession requirements under New Hampshire law. Consequently, the federal government had no established territorial jurisdiction over the courthouse property, calling into question the very authority to enforce federal regulations there.

This Court's Order (Doc. 45) summarily dismissed Defendant's jurisdictional challenge as "unclear" and "frivolous". With respect, there is nothing unclear or frivolous about insisting that the Government prove a fundamental element of its case: that the site of the alleged offense is under federal jurisdiction. The Order asserted that "the court is satisfied that this is a federal courthouse and that Local Rule 83.8 and 41 C.F.R. § 102-74.385 may be enforced here". But

the Court's satisfaction is not evidence. A courthouse building being owned or used by the U.S. does not automatically confer criminal jurisdiction without following the law. Indeed, federal law (40 U.S.C. § 3112) itself requires the United States to formally accept jurisdiction from the state, and provides that *"unless and until the United States has accepted jurisdiction over lands… it shall be conclusively presumed that no such jurisdiction has been accepted"*. In other words, federal jurisdiction is not assumed – it must be affirmatively accepted and documented, typically by filing a notice of acceptance with the Governor of the state. There is no indication that the United States ever filed any acceptance of jurisdiction for the Rudman Courthouse land as required by 40 U.S.C. § 3112 and RSA 123:1. Absent proof of such acceptance, the law presumes no federal jurisdiction exists.

The failure to satisfy RSA 123:1's conditions means the State of New Hampshire retained jurisdiction over the courthouse. The federal Government's attempt to exercise exclusive authority there (by prosecuting Defendant under federal rules) violates New Hampshire's sovereignty as codified in RSA 123:1 and Article I, Section 8, Clause 17 of the U.S. Constitution (which allows federal jurisdiction over enclaves only with state consent). In practical terms, this jurisdictional defect is dispositive – a court cannot lawfully adjudicate a charge when the territorial jurisdiction is not established on the record.

C. The Court's Reliance on Gerhard is Misplaced. In denying the jurisdictional argument, the Order cited United States v. Gerhard, 615 F.3d 7 (1st Cir. 2010), suggesting that Defendants "lack standing" to question the ownership or jurisdictional status of the courthouse land (see Order footnote 2, referencing Gerhard at 25–26). That reliance is in error for several reasons. First, Gerhard did not address RSA 123:1 or the specific statutory precondition that an accurate land description be filed with state authorities. The Gerhard case was a 2010 criminal appeal involving different facts (relating to a standoff and other charges) and did not squarely confront the issue of federal jurisdiction acquired (or not acquired) over a courthouse under New Hampshire law. The passing reference in Gerhard to a defendant's inability to raise a state's rights on the state's behalf cannot be read as a blanket prohibition against a defendant challenging the court's subject-matter jurisdiction. Here, Defendant is not attempting to assert the State's proprietary interests for the State's sake; he is asserting his own right not to be tried or convicted by a court that lacks jurisdiction over the offense. Subject-matter (and territorial) jurisdiction goes to the very power of the court to hear the case – it is elemental and cannot be waived or glossed over. A defendant always has standing to demand that the prosecution prove every element of the offense, including jurisdictional elements.

Indeed, subject-matter jurisdiction can be challenged at any stage of a proceeding and "may be raised at any time" because it is so fundamental. It would be a perverse outcome if the Government could ignore jurisdictional requirements and then block a defendant's objection by claiming he "lacks standing" to enforce the law. Gerhard does not compel such a result, and this Court should not extend that precedent to foreclose legitimate jurisdictional defenses grounded in both state and federal law. To the extent the Court believed Defendants were raising "ownership of the property" on behalf of New Hampshire, Defendant clarifies that his argument is about the court's jurisdiction (or lack thereof) and the Government's failure to carry its burden,

not about vindicating the State's property rights per se. The two concepts overlap only insofar as New Hampshire's withholding of cession (through RSA 123:1 non-compliance) means the United States lacks jurisdiction. Such a challenge is properly before this Court and must be addressed on the merits.

D. Jurisdictional Defect Requires Dismissal. Because the Government did not establish that the Rudman Courthouse is subject to federal jurisdiction for criminal enforcement purposes, the charge against Defendant is jurisdictionally barred. The enforcement of 41 C.F.R. § 102-74.385 (a federal regulation) and a federal Local Rule on non-federal land would be ultra vires. At the very least, it raises a reasonable doubt about an essential element of the offense – i.e., that the order allegedly disobeyed was issued by a federal officer with lawful authority in that place. If the United States had no jurisdiction over the place, then the officer's order was not lawfully enforceable under federal law in that location, and Defendant committed no federal offense. This is not a mere technicality; it is a bulwark of federalism and due process. The Court should reconsider its denial, hold that it was error to assume jurisdiction without proof, and dismiss the charge for lack of jurisdiction.

II. Defective Charging Instrument and Vagueness of the Allegations

Even setting aside the jurisdictional issue, the prosecution suffers from a foundational procedural flaw: the charging instrument itself was fatally defective. Defendant was charged (via citation or information) with "failure to comply with the lawful direction of a Federal police officer" under 41 C.F.R. § 102-74.385. However, the charging document provided only a bare-bones, conclusory statement of the offense, lacking critical details and references to the governing rules that rendered the officer's order "lawful." This omission violated Defendant's right to be clearly informed of the accusations against him.

A. Omission of Essential Regulatory Provisions (41 C.F.R. § 102-74.420 and Local Rule 83.8). The charge as written failed to mention Local Rule 83.8(a) of this District and 41 C.F.R. § 102-74.420, both of which are directly pertinent to the conduct at issue (video recording in the courthouse). Local Rule 83.8(a) is the provision that actually prohibits photographing or recording inside the federal courthouse (except for authorized personnel or special exceptions). It states, in substance, that all persons are prohibited from photographing, recording (audio or video), broadcasting, transmitting, or televising within the Rudman U.S. Courthouse, and likewise prohibited from possessing equipment for such purposes inside the courthouse. In short, LR 83.8(a) is the source of the ban that Defendant was accused of violating. Similarly, 41 C.F.R. § 102-74.420 provides that, except where security regulations or a federal court rule prohibits it, persons may take photographs of entrances, lobbies, and corridors for news purposes. In other words, federal regulations generally allow photography in lobbies for news purposes, unless a court rule (like LR 83.8) prohibits it.

These provisions establish the legal framework that makes an order to stop recording a "lawful direction" in a courthouse. Absent LR 83.8's prohibition, Defendant's act of recording would not have been unlawful at all – indeed, it would be expressly allowed under 41 C.F.R.

§ 102-74.420(c) (permitting photographs in lobbies for news purposes). It is only because LR 83.8(a) exists (and qualifies as a "rule or order" prohibiting photography) that the officer's order to stop recording had any legal basis. Yet the charging instrument never cited LR 83.8 or § 102-74.420, nor did it specify that Defendant was recording video in violation of a court rule. It simply asserted he failed to obey a lawful order, without saying what that order was or why it was lawful. This is a textbook example of a conclusory charge that omits essential elements.

By leaving out the reference to LR 83.8, the charge failed to inform Defendant that he was essentially being accused of violating the court's no-recording rule. By omitting 41 C.F.R. § 102-74.420, the charge hid the fact that there is a general permission to record in public federal areas that had to be overcome by a specific prohibition. The net effect is that the charging document gave Defendant no clear notice of the nature of his alleged illegal conduct – was it the act of recording? Was it merely disobeying an officer (regardless of what the order was)? What rule or law made the officer's command legitimate? These questions were left unanswered in the accusatory instrument.

B. Lack of Specificity and Fair Notice. The Constitution requires that a criminal charge set forth the elements of the offense and enough factual detail to apprise the defendant of what he must defend against. Vague or bare accusations violate due process by "not providing fair warnings" and by risking *"arbitrary and discriminatory enforcement"*. Here, the allegation that Defendant failed to comply with a lawful order was so vague and general that it could encompass virtually any scenario of disobedience, leaving Defendant to guess the factual basis. Was he being charged for refusing to stop filming? For refusing to leave the premises? For something else entirely? The charge did not say. It thus "trapp[ed] the innocent" by not pinpointing what conduct was forbidden. This lack of clarity also invites arbitrary enforcement – an officer or prosecutor could apply the "failure to comply" regulation in an ad hoc manner, as appears to have happened here, without clear standards.

To illustrate the prejudice: Defendant, acting pro se, did not have a precise roadmap of the Government's theory from the charge. He was essentially forced to intuit that the case was about the recording, even though the charging paper did not explicitly mention the recording or the rule against it. A criminal defendant should not have to read the Government's mind; the Government must spell out the offense in plain terms. The omission of LR 83.8 and the failure to describe the nature of the "order" deprived Defendant of the ability to prepare an adequate defense. For instance, had the charge been clearly framed as "recording in the courthouse in violation of LR 83.8 and failing to heed an order to stop," Defendant could have focused on challenging whether LR 83.8 was properly promulgated, whether it was constitutional as applied, whether the order was in fact lawful under the circumstances, etc. Instead, the terse charge obscured these points.

C. Conclusory Language Insufficient to Charge an Offense. A charging instrument that merely parrots a broad regulation without contextualizing it to the defendant's conduct is insufficient. In this case, saying "failed to comply with a lawful direction of a federal police officer" is akin to saying "defendant broke the law" – it's a conclusion, not a particularized accusation. Courts

have invalidated charges that lack such particularity. The defect here is especially egregious because the lawfulness of the order was not self-evident; it depended on the existence of the no-recording rule, which was never cited. In effect, the Government charged Defendant with disobeying an unidentified rule (through the officer's order). That is not how criminal charges work. The Fifth Amendment's Grand Jury Clause (for serious offenses) and the Sixth Amendment's Notice Clause both underscore the necessity of a definite accusation. While Defendant's charge was a petty offense not requiring a grand jury, the due process principle of notice still applies with full force.

Because the charging document was impermissibly vague and omitted essential elements, the conviction cannot stand. A conviction upon an unconstitutionally vague or insufficient charge is itself a denial of due process. This Court should reconsider its prior affirmance and recognize that the charging instrument's defects warrant dismissal or reversal of the conviction. At minimum, it was error for the Court not to address these defects, which were raised in Defendant's appeal. The Court's Order did not refute or even discuss the indictment/information's shortcomings, effectively ignoring a crucial issue. Reconsideration is appropriate to prevent manifest injustice on this ground alone.

III. Selective Enforcement and First Amendment/Equal Protection Violations

The context of this prosecution reveals a deeply troubling pattern of selective enforcement that infringes on constitutional rights. Defendant was targeted for prosecution not because his conduct was uniquely harmful, but because of who he is and what he was trying to record. This raises both First Amendment and Equal Protection concerns, as well as a basic violation of due process in the form of selective prosecution. Defendant respectfully submits that his conviction should be vacated because it was the product of an unconstitutional enforcement of the law.

A. Selective Prosecution Standard. As the Supreme Court has explained, *"Selective prosecution claims… require [the defendant] to show both that the [Government's enforcement] policy had a discriminatory effect and that it was motivated by a discriminatory purpose."*. In other words, Defendant must show that others similarly situated were not prosecuted for similar conduct, and that the decision to prosecute him was driven by an improper motive (such as retaliation for exercising a constitutional right or discrimination based on viewpoint or other arbitrary classification). Here, Defendant can make both showings, or at the very least has raised a strong prima facie case that warrants an evidentiary hearing.

B. Discriminatory Effect – Others Not Prosecuted. The no-photography/recording rule (LR 83.8) is, on its face, a general prohibition applying to "all persons". In practice, however, it is common knowledge that many individuals enter federal courthouses with cell phones and other recording-capable devices. Often, members of the public and even media attend court proceedings or roam the halls. Enforcement of the no-recording rule is sporadic. Defendant is aware of instances where no action was taken against persons who inadvertently took photos or videos in courthouses, or who possessed recording devices (in technical violation of the rule). Yet, in this case, the Government chose to arrest and prosecute Defendant to the fullest extent

for the mere act of filming in the lobby. No warnings beyond the officer's order were given, and no lesser measures (like confiscation of the device or a citation) were pursued – it went straight to arrest and criminal charge.

Defendant attempted to gather and present evidence of this uneven enforcement. In fact, after his trial, he obtained video recordings of interactions with Department of Homeland Security officers (including Officer Michael Plante, who arrested him) and conversations with court personnel, in order to demonstrate how the enforcement of the rule was handled in other situations. He sought leave to supplement the record on appeal with those videos, as they were "relevant to a variety of issues on appeal" (including selective enforcement). The Court denied that motion without viewing the evidence, solely because the videos were "not part of the trial record" and were created after the trial. As a result, the Appeal was decided without considering compelling evidence that might show Defendant was treated differently from others.

Even without the videos formally in the record, the circumstances strongly indicate that Defendant was singled out. The events in question occurred when Defendant (and co-defendant Gerhard) openly stated they intended to return to record a high-profile hearing (the U.S. v. Freeman case). It is reasonable to infer the authorities were particularly keen on stopping Defendant because of the content he sought to capture (court proceedings related to a well-known crypto-currency activist case) and his reputation as a vocal activist. Meanwhile, had a random tourist or a member of the mainstream media been recording generic footage in the lobby, would they have been arrested and prosecuted? Almost certainly not. The disparate treatment is evident: others similarly situated (people with cameras in the courthouse) were not prosecuted, but Defendant was.

C. Discriminatory Purpose – Retaliation for First Amendment Activity. The motive behind this selective enforcement appears to have been retaliatory or censorious. Defendant was engaged in what can be characterized as newsgathering or political expression: he wished to document a public court proceeding (albeit from the lobby). This is activity at least adjacent to the First Amendment – the recording of public officials in a public place has been recognized as protected First Amendment conduct in many contexts (e.g., recording police in public). While a courthouse lobby is not a traditional public forum, it is not a sanctum completely immune from First Amendment concerns. The enforcement of rules within such a space must still be content-neutral and viewpoint-neutral.

Here, the content of Defendant's recording (and his broader anti-authoritarian viewpoint) was the driving force behind the enforcement. The officers knew Defendant was attempting to record a proceeding to expose or criticize the system; indeed, Defendant and Gerhard explicitly asserted their "right to record" at the time. This was not an instance of someone accidentally leaving their phone on – it was a purposeful challenge to the rule. The Government's response – to prosecute criminally – was motivated by a desire to quash this challenge and message. In essence, Defendant was punished because he attempted to exercise what he believed (and still maintains) was a constitutional right to gather information in a public building. This is an impermissible motive. Government action "not related to the suppression of free speech" is

required even for incidental burdens in a nonpublic forum, and here the motive was to suppress a specific instance of speech (recording) and the viewpoint that court proceedings should be publicly accessible.

The evidence of discriminatory purpose can be inferred from: (1) the sequence of events (Defendant announcing intent to record a controversial hearing, then being swiftly arrested), (2) the unusually harsh response (full prosecution rather than a warning or administrative measure), and (3) the lack of similar prosecution of anyone else, which suggests a deliberate choice to make an example of Defendant due to his activism. Moreover, any claim that the enforcement was routine is belied by the fact that the Court officers allowed Defendant and Gerhard to enter on Monday with recording equipment and start recording before arresting them – implying that the Government was setting the stage to confront them, rather than simply stopping recording at the door. This calculated approach indicates an intention to crack down on these particular individuals.

D. Violation of First Amendment and Equal Protection. The selective prosecution of Defendant violates the Equal Protection guarantee embedded in the Fifth Amendment's Due Process Clause (since this is a federal action). When the Government selectively enforces a law based on a defendant's exercise of First Amendment rights, it engages in viewpoint discrimination and unequal treatment, both of which are forbidden. Defendant's case meets the criteria for a selective-prosecution claim: others similarly situated were not prosecuted, and he was targeted for an improper reason. As a result, his conviction cannot stand, because it was obtained in violation of constitutional guarantees. The Court of Appeals in Wayte v. United States noted that even where some expressive conduct is involved, a prosecution will fail if the defendant can show that the enforcement was aimed at speech. Here, Defendant has essentially shown just that – or at least raised a strong presumption – which the Government has not rebutted.

Additionally, the way the no-recording rule was applied here undermines the First Amendment independently. While the district court's Order on Appeal asserted that the courthouse interior "is not a public forum" and thus restrictions on recording did not violate the First Amendment in general, that analysis overlooks the selective nature of the enforcement. Even in a nonpublic forum, the Government may not discriminate based on viewpoint. Local Rule 83.8(a) on its face is viewpoint-neutral (it bans all recording), but if in practice the rule was enforced only against certain viewpoints (e.g., against activists but not against others, or to prevent recording of certain proceedings but not others), then the enforcement is not viewpoint-neutral. Defendant contends that is exactly what happened. The First Amendment injury here is that the Government, by enforcing the rule in this one case, effectively prevented a specific message (the dissemination of a court proceeding by independent activists) from being conveyed, while routinely ignoring other violations that do not carry that message. This kind of selective suppression of information is antithetical to the First Amendment.

E. Fundamental Unfairness (Due Process). Finally, even aside from First Amendment and Equal Protection labels, the selective and uneven application of the law against Defendant constitutes a form of fundamental unfairness that shocks the conscience, thus violating Due Process. The

essence of the rule of law is that like cases are treated alike. It offends due process when the Government wields its prosecutorial power in a special way against an individual for reasons unrelated to the legitimate interests of enforcement. If the purpose of the no-recording rule is, say, to protect the decorum and security of the courthouse, that purpose was not uniquely implicated by Defendant's actions any more than by anyone else's – indeed, his recording was peaceful and caused no disturbance beyond the officers' reaction. Selecting him for prosecution, then, served no legitimate purpose; it served only to punish him for being him. This is an arbitrary exercise of power inconsistent with the Due Process Clause.

Conclusion on Selective Enforcement: The Court's previous Order gave short shrift to these arguments, concluding that Defendants "have not shown" a First Amendment violation or that the rule was unreasonable. Respectfully, that conclusion was reached without the benefit of a hearing or a full evidentiary record. At a minimum, Defendant has demonstrated enough to warrant reconsideration or an evidentiary hearing on the selective enforcement claim. The Court should not simply assume that enforcement was valid; it should grapple with the evidence (or allow it to be developed) showing that this prosecution was a constitutionally forbidden use of Government power. Ultimately, because the prosecution was tainted by unconstitutional motives and effects, the conviction should be set aside.

IV. Structural Denial of Due Process: Lack of Trial Transcript/Record (Sui Juris Defendant)

Perhaps the most glaring procedural due process violation in this case is the lack of any transcript or audio recording of the trial proceedings. Defendant was denied a meaningful appeal because there is no complete record of what transpired during the magistrate judge bench trial. As a sui juris (self-represented) defendant, Mr. Staples did not have counsel to ensure a transcript was ordered or to perfectly preserve issues. The court itself failed to ensure that a record was made and available. This has led to a scenario where significant issues cannot be reviewed on appeal at all, amounting to a structural defect in the proceedings.

The district court's Order on Appeal acknowledged that *"Neither Staples nor Gerhard requested a transcript of [the] trial. For that reason, official transcripts are not part of the record. ... [W]ithout official transcripts, Staples and Gerhard cannot challenge the sufficiency of the evidence or otherwise dispute the evidentiary bases for their convictions."*. In other words, because no transcript exists, the defendants were outright precluded from raising any claims that depended on what evidence was (or was not) presented at trial. This is an astonishing admission: the Court refused to consider challenges to the evidence purely due to the absence of a transcript – an absence which is itself the fault of the system, not the defendant. It is fundamentally unfair to hold the lack of a record against a pro se defendant, especially in a criminal case resulting in a conviction (even a petty offense). The burden is on the court system to provide a record sufficient for appeal, not on a pro se defendant to know arcane transcript-request procedures and pay for transcription in advance.

The Supreme Court has long held that indigent defendants are entitled to a trial record or adequate substitute for appeal, recognizing that appellate review must not be thwarted by lack

of a transcript. In Griffin v. Illinois, 351 U.S. 12 (1956), and later Draper v. Washington, 372 U.S. 487 (1963), and Mayer v. City of Chicago, 404 U.S. 189 (1971), the Court made clear that a defendant must be given a "'record of sufficient completeness' to permit proper consideration of his claims" on appeal. The state (or in federal cases, the court) may not deny a defendant a meaningful appeals process by failing to provide a transcript or equivalent record. While these cases often concern indigent defendants' right to a free transcript, the principle applies broadly as a matter of due process and equal protection – the quality of appellate justice cannot depend on one's ability to secure a transcript. In Mayer, the Supreme Court specifically struck down a rule that provided transcripts only for felony cases but not for petty offenses, calling that an "unreasoned distinction" that violated equal protection. The Court held that even for a $50 fine, if the issues on appeal required a transcript for proper review, the defendant must be provided one (or an adequate alternative) because "the absence of a transcript may effectively disable the defendant from raising certain fundamental issues on appeal." In Mayer, as here, the defendant wished to challenge the sufficiency of the evidence, which cannot be done without a transcript.

In the instant case, the exact scenario cautioned against in Mayer is playing out: Defendant cannot challenge the evidence or factual findings because there is no transcript. The Government has thus been immunized from scrutiny as to whether it actually proved its case (for example, did the prosecution prove that proper jurisdiction was established? Did it prove all elements of 41 C.F.R. § 102-74.385 beyond a reasonable doubt? We'll never know, because there's no record to check). This is an unacceptable outcome under the Due Process Clause. The lack of a transcript is a structural error because it vitiates the appellate process entirely. It is akin to denying Defendant an appeal altogether, since an appeal without a record is an empty gesture.

The fact that Defendant was sui juris amplifies the due process concerns. As a pro se defendant, he did not have an attorney to ensure that a court reporter was present or to later order a transcript. In many districts, petty offense proceedings are at least audio recorded, but here it appears that if any recording was made, it was not preserved or provided. The Magistrate Judge delivered only an oral ruling (no written findings or opinion), which means the only insight into the reasoning and evidence is locked in the unrecorded trial proceedings. By not issuing a written decision with reasons (despite Defendant's request for written findings), the Magistrate Judge further muddied the waters. The district court's Order on Appeal noted that an oral verdict was given and "transcribed" in the sense that a transcript could potentially be produced of that day's proceedings. But no such transcript actually made it into the record. In fact, the Order chastised Defendant for not ordering one, while simultaneously using the lack of it to bar certain appellate arguments. This catch-22 is not due process.

It is important to emphasize that this is not a harmless or trivial issue. Without a transcript or record:

Defendant cannot demonstrate on appeal how the evidence may have been insufficient or contradictory.

Defendant cannot point to specific rulings, objections, or motions made during trial that could constitute error.

Defendant cannot even verify whether the jurisdictional issue was properly addressed (for instance, what if the Magistrate Judge required no proof at all of jurisdiction – that error is effectively unreviewable now).

Defendant cannot show if any constitutional objections (First Amendment, etc.) were raised and improperly overruled, since there is no record of the colloquy.

Essentially, any error that depends on the trial proceedings is insulated from review. This is the definition of a structural problem – the framework for adjudicating the appeal is broken.

In such circumstances, courts have sometimes presumed prejudice or even per se reversible error. At the very least, fundamental fairness demands that the conviction be reconsidered. One remedy could be to vacate the conviction and order a new trial (where a proper record can be made). But here, given the additional substantive issues, the more appropriate remedy is outright dismissal – especially since a new trial would face the same jurisdictional defect and constitutional problems outlined above.

Defendant asserts that the combination of being denied a transcript, being denied a written decision from the trial court, and being proceeded against as a pro se defendant without these safeguards amounts to a structural denial of due process. This Court, sitting in review of the Magistrate's decision, should have ensured that the record was complete or that the appeal could be fairly decided. By not doing so, and by then ruling against Defendant while depriving him of oral argument as well, the Court compounded the due process violation. Reconsideration is warranted to correct this. The Court should not countenance a conviction that was essentially unreviewable on appeal due to lack of a record; to do so undermines confidence in the judicial process.

In sum, the absence of a trial transcript or recording is itself ground for vacating the conviction. At minimum, the Court should have allowed some alternative method of reconstructing the record (e.g., a statement of the evidence or an evidentiary hearing on what transpired). It did not. That was error. The only just outcome now is to set aside the conviction and dismiss the case, as the appellate process has been irreparably compromised.

Request for Full Dismissal or, Alternatively, Oral Argument on All Issues

For the reasons detailed above – lack of jurisdiction, charging document deficiencies, selective enforcement, and structural due process violations – Defendant urges the Court to vacate the conviction and dismiss the charge outright. This case presents multiple independent grounds for dismissal, each of which by itself would warrant relief. Together, they paint a picture of a

prosecution that should never have been allowed to proceed to conviction. Reconsideration is not only appropriate but necessary to prevent a grave miscarriage of justice.

Should the Court have any hesitation about immediately dismissing, Defendant in the alternative requests that the Court grant oral argument (and, if needed, an evidentiary hearing) on all the issues raised in this motion. The prior disposition of Defendant's appeal was done on the papers, without any oral argument. Given the complexity and importance of the jurisdictional and constitutional questions at stake, denying oral argument was unfair and has contributed to the Court overlooking or misunderstanding critical points. An opportunity for Defendant to present his arguments in open court could assist the Court in reaching a fully informed decision. It would also allow the Court to question the Government on these issues – for example, asking the Government to produce evidence of RSA 123:1 compliance (if any exists) or to explain its enforcement policies. If the Government cannot justify federal jurisdiction or rebut the selective prosecution evidence, that will become evident under scrutiny.

Oral argument is warranted whenever a case involves substantial questions of law or fact that are in dispute. Here we have both: novel jurisdictional arguments about federal-state authority, and factual allegations of selective enforcement and missing records. These are not trivial matters; they strike at the heart of the Court's legitimacy to hear the case and the fairness of the proceedings. Allowing a hearing would also create an opportunity to supplement the record appropriately (for instance, taking judicial notice of the absence of any filing under RSA 123:1 for the courthouse property, or receiving testimony on how recordings have been handled in other instances, etc.). Defendant, as a pro se litigant, may not have perfectly packaged these issues in the initial briefs – but through oral advocacy, he can clearly articulate his position and respond to any of the Court's concerns in real time. This dynamic is especially important because, in a written pro se brief, nuance can be lost or arguments misunderstood. The Court's characterization of the jurisdiction argument as "unclear" exemplifies a possible misapprehension that could be cured by dialogue at oral argument.

In the event the Court does not immediately dismiss, Defendant requests that all enforcement of the judgment be stayed and that a prompt hearing be scheduled. The stakes (though a petty offense) include not only the fine or other penalties, but the principle of not having an unlawful conviction on one's record. Defendant is prepared to argue each point thoroughly. If the Court finds any of Defendant's factual assertions need support, Defendant is ready to present evidence or sworn testimony (for example, regarding the lack of RSA 123:1 filings, his own experiences of enforcement, etc.). The Court should not simply assume the Government's positions are correct without adversarial testing – especially when the Government has, to date, offered no evidence to counter many of these contentions (relying instead on procedural technicalities like "no transcript, no appeal" or cursory dismissals like "frivolous").

In summary, Defendant prays that the Court will either: (1) grant this Motion upon reconsideration and dismiss the case in its entirety, thereby vindicating the rule of law and Defendant's rights; or (2) at minimum, set the matter for oral argument on all issues and reserve decision until after such argument (and any necessary fact-finding) is conducted. To do anything

less would be to allow an unexamined and potentially unjust conviction to stand, which this Court, as an Article III tribunal sworn to uphold the Constitution, should not do.

Conditional Notice of Appeal

Notice is hereby given that, in the event this Motion for Reconsideration is denied (in whole or in part), Defendant Frank N. Staples intends to appeal the Court's Order (Doc. 45) and the underlying judgment to the United States Court of Appeals for the First Circuit. This notice is filed conditionally and out of an abundance of caution, recognizing that the time for filing a notice of appeal in a criminal case is short (14 days under Fed. R. App. P. 4(b)). If that deadline has passed or is about to pass, Defendant requests that this Motion be construed liberally as including a timely notice of appeal, or that the Court grant an extension for excusable neglect or good cause given the ongoing nature of these post-judgment proceedings.

Defendant emphasizes that he prefers this Court to grant relief and render an appeal unnecessary. However, if relief is denied, the appellate court will be asked to review all of the issues raised herein: namely, the questions of federal jurisdiction (including compliance with RSA 123:1 and 40 U.S.C. § 3112), the validity of the charging instrument, and the constitutional violations (First Amendment, Due Process, Equal Protection) attendant to this prosecution and conviction. These are issues of significant public importance – for instance, whether the federal government has properly obtained jurisdiction over its courthouses in New Hampshire , and to what extent individuals can be prosecuted for recording public officials – and they merit appellate consideration if not rectified by this Court.

By filing this Conditional Notice of Appeal, Defendant does not waive any argument that the notice of appeal time should be tolled or restarted by the filing of the reconsideration motion. He simply seeks to preserve his appellate rights in light of the complexity of the post-trial timing. If the Court grants the relief requested and dismisses the case, Defendant will promptly withdraw the notice of appeal as moot. If the Court denies relief, Defendant asks that this motion and notice be forwarded to the First Circuit as part of the record on appeal.

Defendant also puts the Government on notice through this filing that he will pursue appellate review if necessary, and he invites the Government to respond to this motion with any contrary evidence or legal arguments now – to perhaps streamline what might otherwise require appellate adjudication. In any event, Defendant stands ready to proceed to the First Circuit should that step be required to obtain justice.

Conclusion

WHEREFORE, for the foregoing reasons, Defendant Frank N. Staples respectfully requests that this Court:

Reconsider its Order (Doc. 45) denying Defendant's appeal of his conviction, and upon reconsideration, vacate the conviction and dismiss the charge against him with prejudice due to lack of jurisdiction, defective process, and constitutional violations; or, in the alternative,

Grant oral argument on all the issues raised and allow any necessary fact-finding, after which appropriate relief may be granted (up to and including dismissal or a new trial if somehow jurisdiction is found to exist);

Stay enforcement of any sentence or judgment during the pendency of this motion and any subsequent proceedings;

And take notice of Defendant's conditional appeal such that, if relief is denied, the case may be promptly transferred to the Court of Appeals for review.

Defendant further prays for any other relief in law or equity that the Court deems just and proper. He asserts all rights conscientiously, and does not waive any objections by the filing of this motion or the conduct of this case sui juris. The structural and constitutional errors presented demand a remedy. Defendant trusts that this Court will uphold the fundamental principles at stake and grant the requested relief.

Dated: May 30, 2025.

Respectfully submitted,

/s/ Frank N. Staples
Frank N. Staples – Defendant, pro se (sui juris)

*[signature]*

332 Merrimack St.
Manchester NH 03103

Certificate of service
_____

5/30/2025   I certify that this motion was filed with the clerk and that a copy will get to the Government via ECF on May 30th, 2025

*[signature]*